## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

---

SEAN GEORGE,

      *Plaintiff*

    v.

OFFICER J. HORNE,
OFFICER [FNU] DEEGAN,
OFFICER [FNU] FLORES,
OFFICER [FNU] MOORE,
OFFICER JOHN DOE 1,
OFFICER JOHN DOE 2,
POLICE CHIEF ERIKA SHIELDS, and
the CITY OF ATLANTA,

      *Defendants*

**CIVIL ACTION
NO. _____
JURY TRIAL DEMANDED**

---

## COMPLAINT

## PRELIMINARY STATEMENT

This is a civil rights action brought under 42 U.S.C. § 1983 and raising

supplemental state law claims against Defendants, individual officers of the Atlanta

Police Department, former Chief of the Atlanta Police Department, and the City of

Atlanta, over the unlawful arrest and prosecution of Plaintiff Mr. Sean George, the

associated excessive use of force against Mr. George during his arrest, and the ensuing damages he suffered.

Like hundreds of other Atlanta residents and individuals throughout the country and the world, Mr. George attended one of several large-scale demonstrations against widespread police brutality and discrimination against Black people following the horrific murder of Mr. George Floyd by a police officer in Minneapolis. Despite complying with all laws and ordinances, Mr. George was prevented from leaving the area by police cordons when Arresting Officer Defendants kicked him, tased him, broke his glasses, and used excessively tight handcuffs against him, causing extreme and lasting pain in Mr. George's arm. Arresting Officer Defendants, employees of the City of Atlanta, were enforcing a 9PM curfew that had been enacted by municipal order; however, the officers began enforcing the curfew against Mr. George before 9PM and without giving notice. Furthermore, the curfew was facially unlawful where it was not narrowly tailored to ensure compliance with the Constitution. Mr. George was charged with a curfew violation which was ultimately dismissed due to "evidentiary reasons".

Mr. George was in custody overnight, including a lengthy "perp walk" through the streets of downtown Atlanta, followed by being forced to sit on the sidewalk for hours before being transferred between multiple makeshift detention

2

locations and eventually to the Atlanta Detention Center, where Mr. George was held for some twelve hours. Mr. George was denied food or water or the ability to use the bathroom despite his requests to do so until shortly before being released; the food he was given was expired. None of the makeshift detention locations permitted social distancing or allowed arrestees to wear masks despite the arrests taking place at the height of the COVID-19 pandemic. Aside from his glasses being destroyed, Mr. George's remaining personal property, including his phone and car keys, were confiscated and Mr. George was unable to retrieve them until several days after his release from the Atlanta Jail.

Mr. George suffered physical and emotional injuries as a result of the violence he experienced at the hands of Defendants. Mr. George's arm was in pain for months as a result of the excessive tightening of the handcuffs. Mr. George was unable to see properly until he could afford to replace the glasses that Defendants destroyed. Mr. George suffered deeply traumatizing injuries as an individual and as a Black person who was unlawfully arrested and subject to excessive force at a demonstration against excessive police use of force against Black people. Mr. George becomes anxious and stressed when driving by the location of his arrest in downtown, causing him to choose between normal travel and avoiding stress. The experience has also had a deeply traumatizing effect on Mr. George when the topic

of police brutality or discrimination surfaces – including when Mr. Rayshard Brooks was killed by Atlanta police officers only days after his arrest, and when Mr. George felt deterred from participating in further demonstrations as a result of the chilling effect of his unlawful arrest and the excessive use of force against him.

Furthermore, as a result of his unlawful arrest and associated criminal charges, Mr. George was kicked out of his grandmother's home. Mr. George was forced to live in his vehicle, punctuated by occasionally sleeping on friends' couches. Mr. George remained homeless for almost a year following the arrest, until the economy began to recover from the COVID-19 pandemic and Mr. George was able to find sufficient work, in conjunction with financial support from others to pay rent. Mr. George seeks declaratory and equitable relief and damages.

## **JURISDICTION & VENUE**

1. This Court has jurisdiction over the subject matter of the complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343. Additionally, this Court has supplementary jurisdiction over state law claims under 28 U.S.C. § 1367.

2. Venue is proper where a substantial portion of the events giving rise to this claim took place within this District and where, on information and belief, Defendants reside in this district.

## PARTIES

*Plaintiff*

3.     Plaintiff Mr. Sean George is a resident of Georgia. Mr. George is Black. Like many others in Atlanta, Mr. George supports efforts to stop police brutality and discrimination and took part in a lawful demonstration to that end on May 30, 2020.

*Defendants*

4.     Defendant Officer J. Horne is or was, at all times relevant, an officer of the Atlanta Police Department and one of the officers involved in the arrest of Mr. George.

5.     Defendant Officer [FNU][1] Deegan is or was, at all times relevant, an officer of the Atlanta Police Department and one of the officers involved in the arrest of Mr. George.

---

1   Officer identities are determined based on information available to Mr. George and counsel pursuant to records obtained during his arrest and prosecution. See Exhibit A. These records do not provide the full first names of Arresting Officer Defendants, which have herein been replaced with "FNU" ("First Name Unknown"). On information and belief, these records conceal the identities of some arresting officers by failing to name them at all. Plaintiff has sought to investigate the identities of these parties through requests under the Georgia Open Records Act, but has thusfar received no responsive records. Plaintiff hopes to amend the complaint through discovery to include full names.

6.     Defendant Officer [FNU] Flores is or was, at all times relevant, an officer of the Atlanta Police Department and one of the officers involved in the arrest of Mr. George.

7.     Defendant Officer [FNU] Moore is or was, at all times relevant, an officer of the Atlanta Police Department and one of the officers involved in the arrest of Mr. George.

8.     Defendant Officers John Doe 1 and 2 are or were, at all times relevant, officers of the Atlanta Police Department who took part in Mr. George's arrest, but whose names were not included in arrest reports and not made available to Mr. George despite efforts to identify them.

9.     All Arresting Officer Defendants acted in concert and conspiracy, were jointly and severally liable, and, at all relevant times, acted under color of state law.

10.    Defendant Erika Shields was the Chief of the Atlanta Police Department at all times relevant. Chief Shields was responsible for the implementation of a curfew that went into effect the night of Mr. George's arrest and has supervisory authority over Arresting Officer Defendants. At all times relevant, Defendant Shields was acting under color of state law.

11.     Defendant City of Atlanta is a municipality created under the laws of the

State of Georgia. At all times relevant, remaining Defendants were

employed by Defendant City of Atlanta.

## FACTUAL ALLEGATIONS

*City Officials Impose a Curfew*

12.     On Friday, May 29, 2020, over one thousand demonstrators descended on

downtown Atlanta for a mass demonstration.

13.     The protest was one of hundreds of demonstrations that took place

throughout the country and the world, primarily over the May 25, 2020

police murder of George Floyd in Minneapolis, other high-profile incidents

of police violence against Black people, and widespread discontent about

police violence, discrimination, and inequality.

14.     By the evening, many acts of vandalism, looting, and property destruction

had taken place, though it is unclear who perpetrated such acts and what

association, if any, they had with the wider community of demonstrators.

15.     During a press conference the next day, May 30, 2020, Defendant Shields

and Keisha Lance Bottoms, then mayor of Defendant City of Atlanta,

announced the imposition of a curfew.

16.    Mayor Bottoms stated, "So we can figure out and sort out who cares about peaceful change in this city and who is here to destroy our city, I am taking the very unusual and extreme step of instituting a curfew in our city this evening from 9PM to sunrise." See, Full Briefing with Mayor Bottoms and Chief Shields, FOX 5 Atlanta (May 30, 2020), available at https://www.fox5atlanta.com/video/689668.

17.    She continued, "Please know where your children are this evening. We do not want to have to arrest your children. We do not want to have to detain anyone. But we will maintain order." Id.

18.    Following her statements, Defendant Shields expanded on her department's thinking and intentions behind the Curfew Order.

19.    Discussing her disposition during the earlier part of May 29, Defendant Shields stated, "...[People] have a right to be heard. That was our posture as we went into last night's event. Initially things were routine." Id.

20.    But, she continued, after about two to three hours, she believed it was clear that "there were people within the protest who were not here to protest. They were here to destroy Atlanta. [Their] behavior was not to make a position statement. It was one of extreme violence." Id.

21.    Defendant Shields used inflammatory language to summarize the threat

posed by potential property destruction, arguing that the alleged law-

breaking elements among the protesters were "a highly calculated terrorist

organization...when you come in and your goal is to inflict harm, property

damage...you are a terrorist." Id.

22.    Defendant Shields emphasized the need for harsh responses to

demonstrations: "We have a zero-tolerance policy. There will be no

lawlessness. It's not about protesting anymore, it's about saving our city...

[alleged "terrorists"] caught us off balance once, it's not going to happen

twice." Id.

23.    She concluded with "Quite frankly, I'm ready to just lock people up." Id.

24.    Discussing the curfew specifically, Defendant Shields stated "The curfew is

useful for us for a simple reason: we have a lot of folks who are out just

lingering and mingling, and it creates high numbers of individuals and it

makes it difficult for us to distinguish who just wants to film the events of

the evening, who just wants to protest, and who wants to throw knives and

shoot guns at innocent people….the curfew allows us to say 'Please, just go

in, and let us deal with the people who are here with ill-intent.' And I'm so

grateful for the curfew for that reason, that it allows us to focus on the problem." Id.

25.     At 5:17PM that day, Mayor Bottoms signed and decreed Executive Order Number 2020-92, an executive order signed pursuant to § 2-181(a) of the Code of the City of Atlanta (herein "the Curfew Order") declaring a state of emergency to exist within Atlanta and imposing a curfew that "shall begin at 9:00pm and shall end at sunrise."

26.     The Curfew Order, among other things, exercised the Mayor's emergency powers to "close streets and sidewalks" and to "close business establishments" in Atlanta. Id. at Section 3.

27.     The Curfew Order included a severance clause to sustain all remaining portions of the Curfew Order in the event that any one section may be found to be "in violation of the Constitution of the United States" or other legal authorities. Id. at Section 6.

28.     The Curfew Order made no exceptions, including for media personnel, individuals traveling through the city, or other individuals engaged in lawful behavior, nor restricted its scope to areas in which civil unrest was taking place.

*Mr. George attends a lawful demonstration*

29. That evening, on May 30, 2020, Mr. George attended a protest in downtown Atlanta near Centennial Park, well before 9PM, as part of the ongoing series of international demonstrations against discriminatory police violence, described <u>supra</u>.

30. The initial part of the protest was largely without incident.

31. But soon after, increasing numbers of police vehicles began descending on the protest.

32. Police officers began harassing everyone present in the area, including individuals dining at outdoor patios at restaurants in the area, by shining lights on them, yelling at them, and blocking off walkways near them.

33. Police officers began aggressively advancing against demonstrators, who at this time remained largely peaceful, and suddenly began carrying out arrests.

34. At this time, estimated to be roughly 8:30PM, Mr. George attempted to leave the area by walking away from the downtown area toward his car, which was parked on a side street near the Five Points MARTA station.

35. But before he was able to leave the area, police cordons had blocked off multiple intersections, making it impossible for Mr. George to leave.

36. On information and belief, no order to disperse had been given at this time.

37.   On information and belief, Mr. George's attempts to leave and subsequent arrest, discussed <u>infra</u>, took place before 9PM.

*The Arrest*

38.   Before Mr. George could make his way back to his vehicle, he was approached by Arresting Officer Defendants and arrested on Broad Street.

39.   Arresting Officer Defendants approached Mr. George and one of them handcuffed him as the others surrounded him.

40.   After handcuffing Mr. George, one of the Arresting Officer Defendants kicked Mr. George in the leg, causing him to fall down, while the remaining Arresting Officer Defendants assisted him in the take down.

41.   One of the Arresting Officer Defendants then struck Mr. George was a taser, despite that he was compliant, had been kicked, was on the ground, and was in handcuffs, while the other Arresting Officer Defendants laughed.

42.   Mr. George's glasses had fallen onto the ground as a result of the Arresting Officer Defendants' use of force against him.

43.   One of the Arresting Officer Defendants then stomped on Mr. George's glasses, destroying them.

44.   One of the Arresting Officer Defendants threw away Mr. George's mask.

45.   The Arresting Officer Defendants then picked Mr. George up.

46.    The Arresting Officer Defendants confiscated Mr. George's backpack and other personal belongings, including his keys and cell phone.

47.    Mr. George complained that the handcuffs were too tight and that he was in pain, but Arresting Officer Defendants ignored him.

48.    Mr. George was in pain from being kicked, knocked to the ground, tased, and handcuffed too tightly.

*Detention*

49.    Despite his distress, Arresting Officer Defendants forced Mr. George to walk in handcuffs to the first detention location, near the intersection of Marietta St. and Edgewood St. on foot.

50.    On information and belief, the walk, which was not direct, was roughly a mile.

51.    Mr. George, along with other detainees, was held at this temporary detention location for roughly four to five hours.

52.    Despite asking for food, water, and to use the bathroom, Mr. George was denied.

53.    Despite being in the vicinity of hundreds of other individuals and not having access to a face mask due to Arresting Officer Defendants' removal of his

mask, Mr. George was not given any personal protective equipment or permitted to socially distance.

54. Mr. George remained in pain as the handcuffs were not loosened, and because he had suffered injuries from his arrest.

55. Mr. George could not see properly due to arresting officers' decision to smash his glasses.

56. At some point late in the night, Mr. George was driven with other arrestees in the back of a "paddy wagon" to the Civic Center MARTA station in midtown, another temporary detention site.

57. At this location, Mr. George was again deprived of food, water, and access to a bathroom despite his requests, and was again kept in unsafe and unsanitary conditions as a result of the pandemic and the failure of jail officials to provide personal protective equipment, was still in pain due to his injuries and excessively tight handcuffs, and still could not see properly as a result of being stripped of his glasses.

58. After several hours, Mr. George and others were transferred again to the Atlanta Detention Center.

59. Only at the Detention Center were his handcuffs finally removed.

60. Nonetheless, Mr. George's hands remained in serious pain and would remain in pain for months after his release.

61. At the Atlanta Detention Center, Mr. George was not able to use the bathroom, drink water, or eat food for several more hours, when he was finally given expired food.

62. At the Atlanta Detention Center, Mr. George was still unable to socially distance, was still not given personal protective gear to protect himself from the pandemic, remained in pain due to his injuries and handcuffing, and still could not see properly without his glasses.

63. Mr. George was finally released from custody early on May 31, 2020.

*Aftermath of Arrest*

64. Mr. George was given a citation charging him with a violation of the Curfew Order.

65. A subsequent police incident report made available to Mr. George during criminal proceedings, written some four months after his arrest by Defendant J. Horne, states – falsely – that Mr. George was arrested after 9PM pursuant to the curfew after being given a warning. See Exhibit A.

66.   This incident report makes no mention of the violent force used against Mr. George and, on information and belief, does not include the names of all arresting officers. <u>Id</u>.

67.   The sole charge alleged against Mr. George would eventually be dropped six months later by the City of Atlanta for "evidentiary reasons." <u>See</u> Exhibit B.

68.   Even after his release, Mr. George's arm was in serious pain and was discolored.

69.   Mr. George's arm remained in pain for months.

70.   Mr. George was unable to return to his car immediately because his keys and other property had been confiscated.

71.   Mr. George was eventually able to obtain a spare car key and collect his vehicle.

72.   Only several days after his ordeal was Mr. George able to retrieve his backpack and other personal property, including his phone, which was kept at a police warehouse in Roswell.

73.   Mr. George had to wait a month until he could afford to replace his glasses, forcing him to go without seeing properly during that time.

74.   As a result of his arrest, Mr. George's grandmother kicked him out of her home, where he had been living.

75.   Mr. George was forced to live in his vehicle for nearly nine months after his arrest.

76.   During this time, Mr. George would rely on friends and family to sleep on their couches or other shared spaces.

77.   Mr. George remained homeless until February 2021, when his older brother and friends were able to help him pay rent in conjunction with a packaging job Mr. George had obtained while living out of his car.

78.   For several more months, Mr. George remained in debt to his friends.

79.   Mr. George was traumatized by his arrest.

80.   He feels deep emotional pain when driving in downtown Atlanta, giving him flashbacks of his brutal arrest and mistreatment.

81.   As a result of these emotional associations, he feels pressured to avoid certain parts of the City of Atlanta, being forced to pick between normal life in Atlanta and avoiding emotional stress.

82.   Mr. George suffered further emotional trauma resulting from his arrest in the aftermath of the police killing of Rayshard Brooks in South Atlanta, as the killing and subsequent protests reminded him of his own mistreatment by police.

83. Mr. George suffered some six months of uncertainty as to his criminal liability under his charges were dropped on January 15, 2021.

*Curfew-Related Events Pertaining to Mr. George's Experience*

84. On the night of Mr. George's arrest, two Black college students, Messiah Young and Tanya Pilgrim, were pulled out of their vehicle in downtown Atlanta and arrested by Atlanta police officers pursuant to enforcement of the curfew.

85. Video footage of the brutal arrest went viral and prompted outrage.

86. Defendant Shields immediately fired two officers involved in the arrest and placed others on desk duty and apologized to the arrestees.

87. Mayor Bottoms personally intervened to ensure that all charges against the arrested students were dropped and apologized to the students.

88. Mayor Bottoms intimated that the arrests and subsequent firings were examples of the City of Atlanta's attitude of reform against police misconduct.

89. The Fulton County District Attorney filed criminal charges against two officers involved in the arrest.

90.   But following a nine-month investigation, criminal charges against both officers were dropped because the DA's office determined that the officers were simply enforcing the curfew as directed.

91.   During the following days, during which the curfew remained in place and was extended by the subsequent Executive Order 2020-94 which imposed a curfew beginning one hour earlier at 8PM, Atlanta residents remained confused about the scope of the application of the Curfew Order because of its overbreadth. See, e.g. Stell Simonton, "A week of curfews in Atlanta creates plenty of confusion," Atlanta Magazine (June 8, 2020) available at https://www.atlantamagazine.com/news%02culture-articles/a-week-of-curfews-in-atlanta-creates-plenty-of-confusion/

92.   On June 3, 2020, with the curfew still in effect, the Defendant City of Atlanta inexplicably announced via Twitter that "exceptions [to the curfew] apply to people seeking medical help, working, first responders & homeless". Id.

93.   On June 5, 2020, Defendant City of Atlanta announced via Facebook that "there are no restrictions on vehicular travel in the city. Businesses do not have to close at 8:00p p.m. during the weekend. Patrons should be advised

they are subject to the curfew's restrictions and must refrain from remaining on the streets and sidewalks within the city." Id.

94.     The same day, Mayor Bottoms announced that the curfew would not be imposed on voters standing in line to vote during the upcoming election. Id.

95.     On information and belief, hundreds of individuals were, like Mr. George, arrested during the enactment of the Curfew Order either for being prevented from leaving an area, or because the curfew was enforced prior to the stated time of 9PM or 8PM. Id.

## CLAIMS FOR RELIEF

### COUNT I
**Excessive Force**
**U.S. Const. Amends. IV and XIV and 42. U.S.C. § 1983**
**Against All Arresting Officer Defendants**

96.     Defendants had a federal and constitutional duty barring them from using excessive force against Mr. George.

97.     Mr. George complied with arresting officers' orders despite his lawful conduct and their unlawful arrest.

98.     Defendants' decision to kick and tase Mr. George after he was already in handcuffs were objectively unreasonable and unnecessary given the totality of the circumstances, and constituted excessive force.

20

99.   Defendants' decision to handcuff Mr. George with excessively tight handcuffs and refuse to loosen them when asked was similarly objectively unreasonable and unnecessary, and constituted excessive force.

100.  Defendants' decision to force Mr. George to walk an extensive "perp walk" to the first detention location after he was physically injured was similarly objectively unreasonable and unnecessary, and constituted excessive force.

101.  Where Defendants did not personally carry out the excessive use of force, they actively assisted in the process and/or did not prevent the excessive use of force.

102.  The excessive use of force caused the damages discussed supra.

## COUNT II
**Violation of First Amendment Rights – Facial and As Applied Challenge to Municipal Curfew Order**
**U.S. Const. Amends I and XIV and 42 U.S.C. § 1983**
**Against All Defendants**

103.  Defendant City of Atlanta has a duty not to adopt or enforce a municipal ordinance that is unconstitutional and violates a person's rights.

104.  Municipal ordinances that regulate First Amendment-protected activity in public fora, including public streets and sidewalks, must be necessary to serve a compelling state interest and be narrowly tailored to achieve that end to pass constitutional muster.

105.  The City of Atlanta's Curfew Order was such an unconstitutional municipal ordinance.

106.  The municipal ordinance was facially unconstitutional where it was not narrowly tailored, in that the ordinance contained no exceptions of any kind for any activity, including normal vehicular or foot traffic, emergencies, or lawful gatherings, did not limit its scope to areas in which unlawful conduct was taking place, and did not distinguish between individuals or groups who were involved in or associated with criminal activity.

107.  Defendant City of Atlanta's subsequent and contradictory public advisories, apologies, and firings regarding the scope and applicability of the curfew, as well as the severance clause within the order, indicate that Defendant was aware that the policy was overbroad and unconstitutional.

108.  Defendant City of Atlanta's public statements leading up to the curfew indicated overbreadth where City officials made clear that they were not distinguishing between lawful activity that they themselves publicly endorsed and unlawful activity.

109.  Defendant City of Atlanta is liable for damages to Mr. George resulting from the enforcement of the Curfew Order against him.

110.   Defendant Shields had a duty not to promulgate, enforce, or direct officers under her supervision to enforce unconstitutional ordinances like the Curfew Order.

111.   Defendant Shields' statements in the lead-up to the curfew's enforcement indicate that she was aware that the Curfew Order was overbroad for the reasons described <u>supra</u>.

112.   Defendant Shields is liable for damages to Mr. George resulting from the enforcement of the Curfew Order against him.

113.   Arresting Officer Defendants had a duty not to enforce an unconstitutional ordinance.

114.   Arresting Officer Defendants are liable for damages to Mr. George resulting from the enforcement of the Curfew Order against him.

115.   Even assuming <u>arguendo</u> that the Curfew Ordinance could pass constitutional muster, its enforcement against Mr. George was plainly overbroad where Mr. George was not permitted to leave the area and where it was enforced against him prior to 9PM.

116.   Arresting Officer Defendants had a duty not to enforce the ordinance in a way that was overbroad against Mr. George and are liable for damages to Mr. George resulting from the enforcement of the Curfew Order against him.

117. Defendant Shields had a duty to ensure that the enforcement of the Curfew Order would be carried out in a way that was not overbroad against Mr. George.

118. However, Defendant Shields' statements leading up to the enforcement of the Curfew Order and the patterns of arrests of individuals, including Mr. George, outside the timeframe delineated by the Curfew Order, indicate that she violated this duty.

119. Defendant Shields is therefore liable for damages to Mr. George resulting from the enforcement of the Curfew Order against him.

## COUNT III
**False Arrest, Retaliatory Arrest / Selective Enforcement**
**U.S. Const. Amends. I, IV, XIV and 42. U.S.C. § 1983**
**Against All Defendants**

120. Arresting Officer Defendants had duty not to arrest Mr. George without probable cause (false arrest), and a further duty not to arrest him in retaliation for exercising a First Amendment-protected right (retaliatory arrest).

121. Arresting Officer Defendants had no probable cause to arrest him, where they knew it was not yet 9PM and where the Curfew Order itself was unconstitutional, and therefore their arrest constituted false arrest.

122. Furthermore, where Arresting Officer Defendants had no probable cause to arrest and arrested him while he was leaving a lawful protest, Arresting Officer Defendants, their conduct constituted retaliatory arrest.

123. Arresting Officer Defendants are liable for the resulting damages to Mr. George.

124. Defendant Shields had a supervisory duty to ensure her subordinates did not engage in false arrest or retaliatory arrest against Mr. George.

125. To the contrary, Defendant Shields' statements during the lead-up to the curfew's enforcement indicate that she was involved in coordinating the responses to the protests and was directly involved in the enforcement of the curfew, such as efforts to dispatch officers and at what time they would be dispatched to arrest citizens pursuant to the Curfew Order, and that she was aware that the enforcement of the Curfew Order would involve arresting individuals engaged in protected speech.

126. Defendant Shields is therefore liable for her subordinates' false and retaliatory arrest of Mr. George and the resulting damages to Mr. George.

127. Defendant City of Atlanta has a duty not to adopt or enforce a municipal ordinance that is unconstitutional and violates a person's rights, including

policies that direct officers to arrest individuals for engaging in protected speech.

128.  Defendant City of Atlanta's Curfew Order and statements of city officials leading up to the imposition of the Curfew Order indicated a desire to the state's police power to punish First Amendment speech.

129.  Defendant City of Atlanta's decision to make exceptions to the Curfew Order for individuals engaged in voting rather than protesting, constitutes selective enforcement of the Curfew Order.

130.  Defendant City of Atlanta's promulgation and enforcement of a policy to arrest demonstrators without probable creates municipal liability for the City of Atlanta for the retaliatory arrest of demonstrators, such as Mr. George.

131.  Defendant City of Atlanta is liable for the resulting damages to Mr. George.

**COUNT IV**
**Unlawful Seizure of Property**
**U.S. Const. Amends. IV, XIV and 42. U.S.C. § 1983**
**Against Arresting Officer Defendants**

132.  Arresting Officer Defendants had a duty not unreasonably seize Mr. George's property.

133.  Seizing property pursuant to an unlawful arrest is an unreasonable seizure.

134.  Arresting Officer Defendants' destruction of Mr. George's glasses, confiscation of his personal property, and deprivation of his ability to drive

pursant to his unlawful arrest were unreasonable seizures of Mr. George's property.

135.   Arresting Officer Defendants are liable for unlawfully seizing Mr. George's property and are liable for resulting damages to Mr. George.

## COUNT V
### Georgia State Tort Claims
Against all Arresting Officer Defendants

136.   Any violent injury or illegal attempt to commit a physical injury upon a person is a tort for which damages may be recovered. O.C.G.A. § 51-1-14.

137.   A person commits the offense of simple battery when he or she either intentionally makes physical contact of an insulting or provoking nature with the person of another; or intentionally causes physical harm to another. O.C.G.A. § 16-5-23.

138.   A person commits the offense of battery when he or she intentionally causes substantial physical harm or visible bodily harm to another. O.C.G.A. § 16-5-23.1

139.   A person commits the offense of simple assault when he or she attempts to commit a violent injury to the person of another, or commits an act which places another in reasonable apprehension of immediately receiving a violent injury. O.C.G.A. § 16-5-20.

140. Where a person's wrongful conduct conduct is intentional or reckless; extreme and outrageous; causes emotional distress; and the emotional distress is severe, that person has committed the tort of intentional infliction of emotional distress. See, e.g. Ups v. Moore, 238 Ga. App. 376 (GA App. Ct. 1999).

141. Where a criminal prosecution is carried out maliciously and without any problabe cause which causes damage to a person prosecuted, that person has a cause of action for malicious prosecution. O.C.G.A. § 51-7-40.

142. Arresting Officer Defendants' use of excessively tight handcuffs against Mr. George, tasing him, kicking him, knocking him to the ground, and forcing him to walk constituted assault and battery against him.

143. Where those actions, as well as the unlawful arrest, ensuing detention, seizure of property, and violations of constitutional rights resulted in Mr. George's emotional trauma, the Arresting Officer Defendants' actions constituted intentional infliction of emotional distress.

144. Where Arresting Officer Defendants knew that they had no probable cause to arrest Mr. George and the arrest resulted in months of criminal charges and prosecution against Mr. George, Arresting Officer Defendants' actions constituted malicious prosecution.

145.   Arresting Officer Defendants' assault, battery, intentional infliction of

emotional distress, and malicious prosecution caused the resulting damages

discussed infra.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Canning respectfully requests:

1. A trial by jury;

2. Compensatory Damages as to all Defendants;

3. Punitive Damages as to all Arresting Officer Defendants and Defendant Shields;

4. Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b) & (c) and as otherwise permitted by law;

5. Any additional relief that this Court deems just and proper.

Respectfully submitted this 31st Day of May, 2022.

/s/ Amith Gupta
Amith Gupta, Esq.
GA Bar No. 149222
American Trial Law Litigators, LLC
925B Peachtree St. NE, #2151
Atlanta, GA 30309
Tel: (408) 355-5782
amithrgupta+law@gmail.com